# 19-2983(L)

**19-3374 (con)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,
*Appellee*,

v.

THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER,
*Defendants*,

DAVID MIDDENDORF, JEFFREY WADA,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANT JEFFREY WADA

Stephen R. Cook
BROWN RUDNICK LLP
2211 Michelson Drive
Irvine, CA 92612

Justin S. Weddle
WEDDLE LAW PLLC
250 West 55th Street, 30th Floor
New York, NY 10019

Roman Martinez
Michael Clemente*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Jason M. Ohta
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130

*Admitted to practice in Maryland only. All work supervised by a member of the DC Bar

*Counsel for Appellant Jeffrey Wada*

March 13, 2020

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 4

STATEMENT OF ISSUES ..... 4

STATEMENT OF THE CASE ..... 4

A. Wada's Role At The PCAOB ..... 5

B. The Alleged KPMG Scheme ..... 7

C. The Evidence At Trial ..... 11

D. Post-Verdict Rulings And Sentence ..... 14

SUMMARY OF ARGUMENT ..... 15

STANDARD OF REVIEW ..... 17

ARGUMENT ..... 18

I. THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF EMBEZZLEMENT ..... 18

A. The Government Was Required To Prove That The PCAOB Entrusted Wada With The Confidential Information At Issue ..... 19

B. The Government Presented No Evidence That The PCAOB Entrusted Wada With The Confidential Information ..... 21

C. The Failure To Prove Entrustment Requires Full Reversal ..... 30

II. THE PCAOB'S INSPECTION SELECTIONS ARE NOT PROPERTY UNDER THE WIRE FRAUD STATUTE ..... 33

A. The Wire Fraud Statute Is Limited To Traditional Forms Of Property ..... 33

B. Confidential PCAOB Information About Inspection Selections Is Not A Traditional Form Of Property ..... 36

III. THE GOVERNMENT'S IMPROPER REBUTTAL DEPRIVED WADA OF A FAIR TRIAL ..... 50

A. The Government's Remarks During Rebuttal Were Improper ..... 50

B. The Government's Improper Remarks Were Highly Prejudicial ..... 58

CONCLUSION ..... 61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Batin v. State*,
38 P.3d 880 (Nev. 2002) ........................................................................ 28, 29

*Board of Trade of the City of Chicago v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ................................................................................ 43

*Carpenter v. United States*,
484 U.S. 19 (1987) ............................................................................ *passim*

*Cleveland v. United States*,
531 U.S. 12 (2000) ...................................................... 34, 35, 40, 47, 49

*Crane v. Kentucky*,
476 U.S. 683 (1986) ................................................................................ 55

*Dirks v. SEC*,
463 U.S. 646 (1983) ................................................................................ 45

*Fountain v. United States*,
357 F.3d 250 (2d Cir. 2004) ............................................................ 19, 38

*Hammerschmidt v. United States*,
265 U.S. 182 (1924) ................................................................................ 19

*McDonnell v. United States*,
136 S. Ct. 2355 (2016) ............................................................................ 46

*McNally v. United States*,
483 U.S. 350 (1987) .................................................................. 33, 47, 49

*Moore v. United States*,
160 U.S. 268 (1895) ................................................................................ 20

*OneSky Litigation Trust v. Sullivan*,
No. 10-cv-344-LM, 2012 WL 124739 (D.N.H. Jan. 17, 2012) .......................... 29

*Pasquantino v. United States*,
544 U.S. 349 (2005) ................................................................................ 35

**Page(s)**

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .......... 43, 44

*Sekhar v. United States*,
570 U.S. 729 (2013) .......... 39

*Skilling v. United States*,
561 U.S. 358 (2010) .......... 1, 34, 36, 49

*State v. Kovach*,
143 P.3d 192 (N.M. Ct. App. 2006) .......... 29

*State v. Taylor*,
378 P.2d 352 (Utah 1963) .......... 29

*State v. Weaver*,
607 S.E.2d 599 (N.C. 2005) .......... 29

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) .......... *passim*

*United States v. Ballard*,
727 F. App'x 6 (2d Cir. 2018) .......... 61

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2012) .......... 58

*United States v. Baroni*,
909 F.3d 550 (3d Cir. 2018), *cert. granted sub nom. Kelly v. United States*, 139 S. Ct. 2777 (2019) .......... 1

*United States v. Bautista*,
23 F.3d 726 (2d Cir. 1994) .......... 50

*United States v. Blaszczak*,
947 F.3d 19 (2d Cir. 2019) .......... *passim*

*United States v. Burse*,
531 F.2d 1151 (2d Cir. 1976) .......... 60

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014) .......... 51, 52, 55, 60, 61

**Page(s)**

*United States v. Elias*,
285 F.3d 183 (2d Cir. 2002) ....................................................................58

*United States v. Friedman*,
909 F.2d 705 (2d Cir. 1990) ....................................................................60

*United States v. Gayle*,
342 F.3d 89 (2d Cir. 2003), *as amended* (Jan. 7, 2004) ....................................17

*United States v. Goldson*,
954 F.2d 51 (2d Cir. 1992) ......................................................................55

*United States v. Hamilton*,
334 F.3d 170 (2d Cir. 2003) ....................................................................31

*United States v. Jones*,
16 F.3d 487 (2d Cir. 1994) ......................................................................31

*United States v. Martinez*,
73 F. App'x 702 (5th Cir. 2003) ................................................................28

*United States v. Melendez*,
57 F.3d 238 (2d Cir. 1995) ...............................................................51, 58

*United States v. Modica*,
663 F.2d 1173 (2d Cir. 1981) ..................................................................60

*United States v. Northway*,
120 U.S. 327 (1887)..................................................................................20

*United States v. Novod*,
927 F.2d 726 (2d Cir. 1991) ....................................................................30

*United States v. Parker*,
903 F.2d 91 (2d Cir. 1990) ......................................................................58

*United States v. Perez*,
144 F.3d 204 (2d Cir. 1998) ..............................................................50, 51

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) ....................................................................17

**Page(s)**

*United States v. Sampson*,
898 F.3d 270 (2d Cir. 2018) ....................................................................20

*United States v. Sayklay*,
542 F.2d 942 (5th Cir. 1976) ....................................................27, 28, 30

*United States v. Scotti*,
47 F.3d 1237 (2d Cir. 1995) ...............................................................31, 32

*United States v. Selwyn*,
998 F.2d 556 (8th Cir. 1993) ...............................................................27, 30

*United States v. Starr*,
816 F.2d 94 (2d Cir. 1987) ..................................................................19

*United States v. Stevens*,
559 U.S. 460 (2010)..............................................................................46

*United States v. Trapilo*,
130 F.3d 547 (2d Cir. 1997) ....................................................................34

*United States v. Truong Dinh Hung*,
629 F.2d 908 (4th Cir. 1980) ....................................................................49

*United States v. Vebeliunas*,
76 F.3d 1283 (2d Cir. 1996) ....................................................................31

*United States v. Williams*,
690 F.3d 70 (2d Cir. 2012) ......................................................................51

*United States v. Yip*,
930 F.2d 142 (2d Cir. 1991) ....................................................................19

*United States v. Young*,
470 U.S. 1 (1985)...................................................................................51

*United States v. Young*,
955 F.2d 99 (1st Cir. 1992)......................................................................21

## STATUTES

15 U.S.C. § 7201 *et seq*.........................................................................5

**Page(s)**

15 U.S.C. § 7202(b)(1) ....... 5

15 U.S.C. § 7213 ....... 42

15 U.S.C. § 7213(a)(1) ....... 5

15 U.S.C. § 7214(a)(1) ....... 5

15 U.S.C. § 7215(c)(4) ....... 5

15 U.S.C. § 7217(a) ....... 5

18 U.S.C. § 371 ....... 8, 33

18 U.S.C. § 793 ....... 48

18 U.S.C. § 794 ....... 48

18 U.S.C. § 798 ....... 48

18 U.S.C. § 1030 ....... 33

18 U.S.C. § 1030(a)(1) ....... 48

18 U.S.C. § 1341 ....... 34

18 U.S.C. § 1343 ....... *passim*

18 U.S.C. § 1344 ....... 33

18 U.S.C. § 1349 ....... 8

18 U.S.C. § 1905 ....... 48

18 U.S.C. § 3231 ....... 4

28 U.S.C. § 1291 ....... 4

50 U.S.C. § 783(a) ....... 48

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) ....... 20

**Page(s)**

Fed. R. App. P. 4(b)(1)(A)(i) ....................................................................4

Fed. R. App. P. 28(i) ....................................................................17

3 W. Fletcher, *Cyclopedia of Law of Private Corporations* § 857.1 (rev. ed. 1986) ....................................................................43, 45

*Oxford English Dictionary* (3d ed. 2018) ....................................................................20, 21

Ellen S. Podgor, *Criminal Fraud*, 48 Am. U. L. Rev. 729(1999) ....................................................................33

Restatement (First) of Torts § 757 (1939) ....................................................................44

# INTRODUCTION

This case presents yet another example of federal prosecutors stretching the wire fraud statute beyond its breaking point. *See, e.g.*, *United States v. Baroni*, 909 F.3d 550 (3d Cir. 2018), *cert. granted sub nom. Kelly v. United States*, 139 S. Ct. 2777 (2019) (No. 18-1059); *Skilling v. United States*, 561 U.S. 358 (2010). That statute is not an all-purpose tool for policing every form of unethical conduct. Rather, it prohibits *fraudulent schemes* to obtain *money* or *property*. Here, the convictions below involved neither "money," nor "property," nor a "fraudulent scheme." This Court should not acquiesce to an unfounded and unprecedented expansion of criminal liability beyond what Congress has authorized. The convictions below should be reversed.

Appellant-Defendant Jeffrey Wada was an employee at the Public Company Accounting Oversight Board (PCAOB), a regulatory entity that Congress created to oversee public accounting firms. The PCAOB fulfills that mandate by establishing auditing rules and standards, registering public accounting firms, and bringing enforcement proceedings. The PCAOB also conducts inspections of accounting firms. According to the Government, Wada improperly disclosed information about upcoming inspections to a former PCAOB colleague who had joined the international accounting firm KPMG. Its main theory was that Wada told his former colleague which KPMG audits in the United States the PCAOB

was planning to inspect. That colleague passed on the information to a KPMG partner, who in turn passed it along to yet others at the firm, who then used the information to prepare for the inspections. Based on those allegations, the Government indicted Wada for conspiracy and wire fraud.

The prosecution was ill-conceived from the start. As an initial matter, the Government overlooked that the wire fraud statute requires proof of *fraud*, not merely theft or some other form of misconduct. The Government's only fraud theory was that Wada had "embezzled" confidential information from the PCAOB. But embezzlement requires proof that the converted property had initially been "entrusted" to the embezzler, and the Government failed to offer *any* evidence that the PCAOB had entrusted Wada with the relevant confidential information. Indeed, the indictment itself stated that Wada "had no legitimate reason to access" that information, and the evidence at trial showed that PCAOB confidentiality rules *prohibited* Wada from accessing it.

The prosecution was also inherently flawed because it did not involve "property" as required by the wire fraud statute. The Government alleged that Wada had leaked confidential information about which audits would be inspected by the PCAOB. But that form of confidential regulatory information has *never* been considered "property" in the history of the federal fraud statutes. That

sweeping expansion openly defies the Supreme Court's repeated insistence that the wire fraud statute remain limited to "traditional" forms of property.

The misguided prosecutorial zeal that informed the charging decision also spilled over into the courtroom during trial. The most significant problem arose during the rebuttal summation. At that point, it had become clear that the Government was struggling to meet its burden of proof, especially given the unreliability of its lead witness, a former PCAOB employee who himself had stolen confidential information. In an effort to rehabilitate the witness, the prosecutor improperly vouched for the witness and for the reliability of the Government's investigation, mischaracterized and maligned the theory of defense, and instructed the jury on how certain witnesses—including federal agents—*would have* testified if they had been called to do so. Those remarks substantially prejudiced Wada because they targeted the precise issues upon which guilt or innocence would turn.

For all these reasons, the judgment below should be reversed. This Court should reverse Wada's convictions and enter a judgment of acquittal, or at the very least order a new trial in light of the improper rebuttal summation. Either way, his convictions cannot stand.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. That court entered a final judgment of conviction on October 11, 2019. SPA48-54. Wada filed a timely notice of appeal on October 15, 2019. A197; Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether Wada's convictions must be reversed because the Government failed to establish that Wada "embezzled" information from the PCAOB.

2. Whether Wada's convictions must be reversed because the PCAOB selection information at issue here is not "property" under the wire fraud statute.

3. Whether Wada is entitled to a new trial because the Government's improper remarks during rebuttal deprived Wada of a fair trial.

## STATEMENT OF THE CASE

The Government alleged that Wada leaked confidential PCAOB information and charged him with conspiracy to defraud the Securities and Exchange Commission (SEC) and the PCAOB, as well as two substantive counts of wire fraud. A197. The jury acquitted Wada of conspiracy to defraud the SEC, but convicted him of the remaining counts. The U.S. District Court for the Southern District of New York (Oetken, J.) sentenced Wada to nine months' imprisonment. SPA48-49.

### A. Wada's Role At The PCAOB

From 2005 to 2017, Wada worked at the PCAOB, the regulatory entity Congress created to oversee the accounting firms that audit public companies. *See* Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq*. The Act vests the PCAOB with broad regulatory and enforcement authority. The PCAOB may promulgate rules, including professional standards, "as may be necessary or appropriate in the public interest or for the protection of investors." *Id.* § 7213(a)(1). For example, the PCAOB creates substantive auditing procedures that accounting firms must follow when conducting audits. A217-18. Those audit procedures and rules have the same force as rules issued by the SEC, 15 U.S.C. § 7202(b)(1), which oversees the PCAOB, *id.* § 7217(a).

The PCAOB is further authorized to investigate and discipline registered public accounting firms and their employees, and may "impose such disciplinary or remedial sanctions as it determines appropriate." *Id.* § 7215(c)(4). Particularly relevant for this case, the PCAOB also conducts a "continuing program of inspections" of registered public accounting firms to ensure their compliance with the rules of the PCAOB, the SEC, and professional standards. *Id.* § 7214(a)(1).

The PCAOB has several inspection programs, one of which is the Global Network Firm (GNF) program. That program oversees the audits conducted by the six largest accounting firms: KPMG, Ernst & Young, Deloitte & Touche, PwC,

Grant Thornton, and BDO. A219. The GNF program inspects those firms each year by reviewing their firm-wide quality control systems and a subset of the audits that each firm conducted—normally around 50 inspections per firm. A220-21. After the PCAOB selects the specific audits it plans to inspect, it notifies the firms several weeks in advance of the inspection to give them time to prepare. A237-38.

The GNF Program has designated teams for each of the six accounting firms, and those teams are further subdivided into different components and subgroups. A221-22; A294-95. All employees across the various groups are subject to the PCAOB's general confidentiality rules, which prohibit the unauthorized disclosure of nonpublic information. A231-33. The PCAOB's confidentiality rules also prohibit employees in different components from sharing planning and inspection information with other PCAOB employees. A277-78. Thus, for example, a PCAOB employee in the *international component* of the inspections team for a particular firm is not authorized to access information specific to the *U.S. component* of the inspections team. A249; A277-78.

The GNF teams and components keep the inspection selections in large spreadsheets called "engagement profile[s]" or "GNF Planning Profile[s]." A230-31. For instance, the KPMG-U.S. inspections team maintains its own GNF Planning Profile that contains its selections for inspecting KPMG's audits in the United States—not KPMG's global audits. A234-35. PCAOB inspectors who

work on other firm teams or other components of the KPMG team have no reason to access the KPMG-U.S. Planning Profile, and they are forbidden from doing so. A249-51; A253-54. Indeed, the 10-15 person KPMG-U.S. planning team is merely a subset of the 40-50 person KPMG-U.S. inspections team. A230, A255.

Wada joined the PCAOB as an inspector in 2005. A201. He was assigned to the planning group for PwC. A741; A802. In 2012, he became an inspections leader for KPMG's international affiliate, KPMG-Japan. A201; A255; A351. Wada did not play any role in the inspection planning group for KPMG. A294. Nor did Wada work on the KPMG-U.S. inspections team at any pertinent time, A255, so he was not authorized to access that team's confidential information, including its GNF Planning Profile. A249. Wada left the PCAOB in March 2017. A78 ¶23.

### B. The Alleged KPMG Scheme

In January 2018, the Government indicted Wada, along with several KPMG employees, for participating in a scheme to acquire and disseminate confidential information about upcoming PCAOB inspections. A68-121. According to the Government, Wada leaked inspection selections to KPMG employee Cynthia Holder before the PCAOB officially announced them to KPMG. The Government claimed that Holder then passed along that information to a KPMG partner, Brian Sweet, who in turn conveyed the information to others at the firm, including David

Middendorf, Thomas Whittle, and David Britt. Around that same time, the Government announced that Sweet had pleaded guilty under a cooperation agreement. A379; A364.

The indictment charged Wada and the remaining four KPMG employees with conspiracy to defraud the SEC, 18 U.S.C. § 371; conspiracy to commit wire fraud, *id.* §§ 1343, 1349; and two substantive counts of wire fraud, *id.* § 1343.[1] A68-121. Whittle and Holder pleaded guilty; Britt was severed from the trial. A26-27; Dkt. No. 189. The indictment alleged a scheme that transpired over the course of three years, from 2015 to 2017.

The 2015 conduct primarily related to Sweet and Holder, both of whom left the PCAOB for KPMG that year. A300; A308. Sweet had been an associate director of PCAOB's KPMG-U.S. inspections team, and Holder had been an inspections team leader. A299; A784. Before departing the PCAOB, Sweet "copied the contents of" his PCAOB computer, including the 2015 GNF Planning Profile spreadsheet and other PCAOB files that he thought would help him at KPMG. A80-81 ¶30; A301; A467. Throughout 2015, Sweet shared information from the planning profile with his new bosses at KPMG—Whittle, Britt, and Middendorf—ultimately disclosing the complete list of inspections for 2015. A81-

[1] The indictment included a third wire fraud count against Middendorf, Whittle and Britt in connection with their 2015 conduct. *See* A115-16 ¶¶96-97.

84 ¶¶32-41. During that time, Sweet separately obtained confidential PCAOB information from former colleagues at the PCAOB by inviting them to meals and drinks and asking them "probing questions" about their work. A327. Sweet allegedly obtained confidential information from Holder while she still worked at the PCAOB. A88-92 ¶¶47-54. And Holder, like Sweet, copied confidential documents related to KPMG-U.S. when she left the PCAOB for KPMG. A92-93 ¶¶55-57; A309. There is no allegation that Wada was involved in any of this misconduct.

Instead, the Government alleged that Wada had told Holder, shortly after she joined KPMG, that the PCAOB was going to inspect a big bank in Switzerland and Japan. A93 ¶58; A720-21. The only testimony the Government ultimately presented to support that allegation came from Sweet, who claimed that Holder told him she learned the information from Wada. A310-12. That information allegedly enabled Sweet to deduce which KPMG clients were going to be inspected. *Id.*

The Government also alleged that, in 2016, Wada passed along nonpublic information about the PCAOB's upcoming inspections of KPMG audits in the United States. A95 ¶63. According to the indictment, "[b]ecause Wada was not on the KPMG inspections team, he had *no legitimate reason* to access the PCAOB's internal inspection schedule for KPMG." A96 ¶65 (emphasis added).

The Government alleged that Wada nonetheless accessed the KPMG-U.S. team's planning information and discussed the upcoming banking inspections with Holder over the phone. A95 ¶63; A313-15. Holder then relayed that information to Sweet, who in turn told Middendorf, Whittle, and Britt. A95-97 ¶¶64-67; A316-21. Based on that information, KPMG conducted "re-reviews" of previously completed audits in order to prepare for the forthcoming inspections. A322. KPMG's 2016 re-reviews comported with all audit standards for documenting audit work. A619-20.

Finally, the Government alleged that Wada told Holder about the PCAOB's nonpublic inspection selections for KPMG-U.S. in 2017. According to the indictment, Wada first relayed information about some of the PCAOB's preliminary inspection plans and subsequently (a month later) provided the final inspection selections. A102-03, A106 ¶¶73, 81. That information related to inspections of KPMG audits in the United States, not inspections of KPMG's international affiliates. Again, Holder is alleged to have passed that information to Sweet, who then relayed it to Middendorf, Whittle, Britt, and others. A103-04, A106-08 ¶¶74-78, 82-83; A358-60. KPMG's General Counsel learned about the information and began an investigation. A492; A361-62. KPMG disclosed to the PCAOB that it had learned this information, and there is no evidence that KPMG otherwise used it. A484-85.

### C. The Evidence At Trial

Sweet's testimony was the linchpin of the Government's case at trial. It was the only direct evidence identifying Wada as the source of the inspection information. A313; A330; A354-55; A738-39. Yet Sweet himself had never actually communicated with Wada after leaving the PCAOB. A391-98; A474. Instead, Sweet testified that Holder told him that Wada was the source of the information, and he "assume[d] that" Holder was telling the truth. A399-400. Holder never testified, and no other witness corroborated Sweet's claim. Sweet also provided the only testimony opining that Wada was a knowing participant in the broader KPMG conspiracy. A313; A330; A354-55. The alleged co-conspirators Whittle and Middendorf, for their part, had never heard of Wada. They met him for the first time in the courtroom. A550; A707-08.

The Government's substantial reliance on Sweet proved problematic throughout the trial because Sweet was plagued by serious credibility problems. On the witness stand, Sweet admitted to "repeatedly" lying about the nature of the scheme to the KPMG investigators, federal agents, and prosecutors. A304-78; A381-89; A405-31; A436-65; *see also* A465 ("Q. It would be fair to conclude that you were willing to tell a lie, even if it is a criminal lie, if you believe it will advance your own self-interest? A. I have certainly done that in connection with all of the things I've talked about in this case. That is true."). Sweet also admitted

to perjury, mortgage fraud, cheating on his taxes both before and after his cooperation agreement with the Government, stealing confidential information from his prior employer, PwC, in the same manner that he had done from the PCAOB, and numerous other lies. A366-78; A384. During trial he even admitted to new crimes that he *still* had not disclosed to the Government. A381-89; A405-31; A436-65.

The Government tried to compensate for Sweet's unreliability with a patchwork of telephone calls, text messages, and entry logs from the PCAOB's computer system. A766-67. But that evidence amounted to more noise than signal. For instance, the Government repeatedly emphasized that Wada had logged on to the PCAOB's computer system during the days when the information was leaked, suggesting that it proved Wada was the leaker. *See id.* But as set forth in the parties' stipulation, the PCAOB's computer system does not track what folders a user accesses; it simply shows that Wada logged on at work. *See* A558.

Further, the Government failed to rule out alternative theories equally consistent with the evidence. For example, Sweet admitted that other employees still working at the PCAOB had also leaked confidential information to him. One such former colleague was Bob Ross, a high-ranking PCAOB banking inspection specialist and friend with whom Sweet maintained "a very close relationship." A255; A432. Ross worked on KPMG inspections, and Sweet acknowledged that

Ross repeatedly provided him with confidential PCAOB information. A255; A329; A404. Moreover, Sweet's emails to Whittle and Britt during the relevant period show that he met with Ross on several occasions in order to probe him for confidential information. A432-34. Sweet even had lunch with Ross the same day that Sweet gave Whittle the names of approximately twelve preliminary banking inspection selections for 2017. A333; A349-50; A353; A404.

The Government also failed to present any evidence that the PCAOB had "entrusted" Wada with any of the information that had been leaked. Proof of entrustment was necessary because the Government's fraud theory was that Wada had "embezzled" the information, and embezzlement occurs only when stolen property is initially "entrusted" to the embezzler. A778 (Jury Charge); *infra* at 18-32. Instead, the evidence showed that Wada was *prohibited* from accessing the 2016 and 2017 inspection information because he did not work on the KPMG-U.S. inspections team. A249-51; A253-55; A277-78. That evidence tracked the indictment, which stated that "[b]ecause Wada was not on the KPMG inspections team, he had no legitimate reason to access the PCAOB's internal inspection schedule for KPMG." A96 ¶65. And no evidence was introduced to establish that Wada was entrusted with information about a bank inspection in Switzerland or Japan.

Finally, in its rebuttal summation, the prosecutors made a series of improper statements vouching for the truthfulness of Sweet's testimony, describing what various *non*-witnesses would have said if they had been called, and impugning the defense for advancing arguments in the alternative. *See infra* at 50-61. Defense counsel objected on the grounds that such statements were both inappropriate and prejudicial. A742-43; A761-64; A766-67 (misstatements); A766; A771-73; A776-77 (objections). The district court rejected defense counsel's request for a curative jury instruction. A766; A771-76.

The jury acquitted Wada on the lead count—conspiracy to defraud the SEC—but found him guilty on both wire fraud counts and the count for conspiracy to commit wire fraud. *See* SPA48.

### D. Post-Verdict Rulings And Sentence

On April 12, 2019, Wada moved for judgment of acquittal, or in the alternative, a new trial. Dkt. No. 338; *see* A54. The district court denied the motions on September 9, 2019. SPA23-39. The court rejected Wada's argument that the Government had failed to prove the "entrustment" element of embezzlement. SPA31-32. It concluded that "Wada in fact was entrusted by the PCAOB with the inspection information in the [PCAOB computer] system, including the KPMG-US inspection lists, *irrespective of company policies about proper use of and access to the information*." *Id.* (emphasis added).

The district court likewise rejected Wada's argument that PCAOB selection information does not constitute property under the wire fraud statute. SPA24-25 (citing SPA14-20). It concluded that, under Supreme Court precedent, confidential information constitutes property regardless whether it is "held by the government, a private entity, or a statutory nonprofit corporation such as the PCAOB." SPA16. Finally, the court held that the prosecutors' remarks during rebuttal were not improper. The court sentenced Wada to nine months' imprisonment to be followed by three years of supervised release. *See* SPA49-50.

## SUMMARY OF ARGUMENT

I. Wada's convictions must be reversed because the Government failed to establish that he participated in a "scheme . . . to defraud" as required by the wire fraud statute. 18 U.S.C. § 1343. The Government's fraud theory was that Wada "embezzled" the PCAOB's confidential inspection information in 2016 and 2017. An essential element of embezzlement is entrustment—the property unlawfully converted must have been initially entrusted to the embezzler. At trial, however, the Government failed to provide *any* evidence of entrustment. Instead, it presented evidence of the opposite: Because Wada did not work on the KPMG-U.S. inspections team, he was not authorized to access the inspection information that was ultimately leaked. Nor did the Government introduce any affirmative evidence that Wada had been entrusted with information about the PCAOB's

upcoming inspections of KPMG's banking audits in Switzerland or Japan. Those flaws are fatal to the Government's wire fraud and conspiracy counts. Both federal and state courts have faithfully enforced the entrustment element that is required to prove embezzlement, and this Court should do the same.

II. Wada's convictions must also be reversed because he did not defraud the PCAOB of "property" as required by the wire fraud statute. 18 U.S.C. § 1343. The Supreme Court has repeatedly emphasized that the fraud statute is limited to "*traditional*" forms of property that have long been recognized at common law. The information at issue here—selection information about the PCAOB's upcoming inspections—does not meet that requirement; it is an entirely novel conception of property.

This Court's recent decision in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019)—although incorrect as noted in Judge Kearse's dissent—is not to the contrary. Under *Blaszczak*, whether a particular item of confidential government information constitutes "property" turns on a fact-intensive analysis of the particular features of the information at issue. Here, that inquiry shows that information about the PCAOB's upcoming inspection selections, unlike the substantive information in *Blaszczak*, is not property under the wire fraud statute.

III. At a minimum, Wada is entitled to a new trial because the Government's rebuttal summation was laden with improper remarks that denied

him a fair trial. First, the prosecutor improperly vouched both for its key witness Brian Sweet, whose credibility had crumbled over the course of the trial, and for the quality of the Government's investigation. Second, the prosecutor instructed the jury on how several individuals—federal agents and PCAOB employee Bob Ross—*would have* testified if they had been called as witnesses at trial. Third, the prosecutor mischaracterized and attacked the defense for making arguments in the alternative. All of those remarks were plainly improper under this Court's precedent. They also substantially prejudiced Wada because they were strategically directed at the precise issues upon which guilt or innocence would turn.

IV. In addition to raising the issues noted above, Wada joins the brief of his co-appellant Middendorf to the extent applicable to him. *See* Fed. R. App. P. 28(i). Specifically, Wada joins Parts I and II of Middendorf's brief.

## STANDARD OF REVIEW

This Court reviews *de novo* questions of statutory interpretation and challenges to the sufficiency of the evidence. *See United States v. Gayle*, 342 F.3d 89, 91 (2d Cir. 2003), *as amended* (Jan. 7, 2004); *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010). A prosecutor's improper remarks warrant reversal of conviction when they result in "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United*

*States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (citation omitted). This Court reviews the denial of a new trial for abuse of discretion. *Id.*

## ARGUMENT

### I. THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE OF EMBEZZLEMENT

One requirement of the wire fraud statute is, of course, the commission of a fraudulent act. 18 U.S.C. § 1343. Fraud, unlike theft, requires that the unlawful taking of property occur by *dishonest means*. Here, it is undisputed that the Government alleged only one type of fraudulent act: embezzlement. It is also undisputed that a requisite element of embezzlement is *entrustment*—that is, the stolen property must have been initially entrusted to the embezzler before the property was unlawfully converted. At trial, however, the Government presented no evidence that Wada was entrusted with the PCAOB inspection information. Instead, the evidence showed the opposite: Wada was not a member of the KPMG-U.S. inspections team and was prohibited from accessing that team's inspection information. For that reason, the indictment unequivocally stated that Wada "had no legitimate reason to access the PCAOB's internal inspection schedule for KPMG." A96 ¶65. Because the Government failed to prove embezzlement, Wada's convictions must be reversed.

### A. The Government Was Required To Prove That The PCAOB Entrusted Wada With The Confidential Information At Issue

"An essential element" of wire fraud is "proof of a 'scheme or artifice to defraud.'" *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (citation omitted); *see also Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004). Proving fraud requires more than proving theft; fraud specifically requires that the unlawful taking of property occur "by dishonest methods or schemes." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (citation omitted); *see also Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("One would not classify robbery or burglary among frauds."). One way to satisfy that fraud element is by proving embezzlement. *See United States v. Yip*, 930 F.2d 142, 146 (2d Cir. 1991); *Carpenter*, 484 U.S. at 27.

Here, the Government's two substantive wire fraud charges alleged that Wada committed fraud by "embezzling" the PCAOB's confidential information about upcoming inspections of KPMG-U.S. *See* A116-18 ¶¶ 99-101; A123; Dkt. No. 353 at 19, 29-30 (Gov't Opp. to Defs' Mot.).

There is no disagreement about the basic definition of embezzlement. The district court's final jury instructions defined embezzlement as

> the fraudulent appropriation of property by a person to whom such property has been entrusted.
>
> A person commits embezzlement when he, with the intent to defraud, converts to his own use property belonging to another where the property initially lawfully came within his possession or control.

A778 (Jury Charge); *see also* A123 (Government's proposed charge). That definition of embezzlement has deep historical roots. *See United States v. Sampson*, 898 F.3d 270, 277-78 (2d Cir. 2018); *Moore v. United States*, 160 U.S. 268, 269 (1895); *United States v. Northway*, 120 U.S. 327, 331, 334 (1887).

The key element that separates embezzlement from other forms of theft—such as larceny, robbery, or burglary—is that the stolen property must initially be *entrusted* to the embezzler. To "entrust" property to a person means "[t]o place" one's property "in the care, custody, or charge of a specified person," "to commit the safety of . . . one's property . . . *to* the care or protection of another," or "[t]o assign the responsibility for something valued or important to (a person, organization, etc.)." *Entrust*, *Oxford English Dictionary* (3d ed. 2018); *see also Entrust*, *Black's Law Dictionary* (11th ed. 2019) ("To give (a person) the responsibility for something . . . ."). As then-Judge Breyer explained the concept underlying entrustment:

> The notion of "fraudulent conversion," at the heart of embezzlement, may sound obscure, but, in fact, it is not. It essentially refers to, say, a bank teller, trustee, or guardian using money entrusted to him by another person for his own purposes or benefit and in a way that he knows the "entruster" did not intend or authorize.

*United States v. Young*, 955 F.2d 99, 102 (1st Cir. 1992) (Breyer, J.); *see also id.* at 102-03 (discussing common law embezzlement).

Thus, for the Government to prove fraud by embezzlement, it had to show that the PCAOB had deliberately placed the inspection information in Wada's "care, custody, or charge." *Entrust*, *Oxford English Dictionary*; *see also Young*, 955 F.2d at 102. None of the foregoing is disputed by the Government.

### B. The Government Presented No Evidence That The PCAOB Entrusted Wada With The Confidential Information

1. The Government failed to present *any* evidence that the PCAOB had entrusted Wada with the confidential information about the upcoming inspections that Wada allegedly divulged to Holder.

From the very beginning of the case, the Government seemed entirely unaware of the entrustment element of the crime it had charged against Wada. The indictment, for instance, alleged the exact opposite of what the Government needed to prove to establish embezzlement. Instead of alleging that the PCAOB had entrusted Wada with the KPMG-U.S. inspection information, the Government stated that "[b]ecause WADA was *not* on the KPMG inspections team, he had *no legitimate reason to access* the PCAOB's internal inspection schedule for KPMG." A96 ¶65 (emphasis added). At times, the indictment even characterized its allegation as a "theft and conveyance" instead of "embezzlement." A100 ¶72.

At trial, the Government made no effort to prove entrustment at all. Indeed, it seemed intent on establishing the opposite claim that Wada was *prohibited* from accessing the information about KPMG-U.S. inspections, just as it had alleged in

the indictment. The Government engaged in an extended colloquy on this point with its own witness, Stephanie Rodriguez, the PCAOB's Associate Director and U.S. Team Lead for KPMG. In response to the Government's questioning, Rodriguez repeatedly confirmed that PCAOB employees who are not on the KPMG-U.S. inspections team have no reason to access the GNF Planning Profile and are forbidden from doing so. *See, e.g.*, A249 ("Q. Would it be typical for the member of one planning team, say the Deloitte planning team, to look at the GNF profile for the KPMG planning team? A. Not in my experience, no. Q. Why not? A. Because the information contained within this file is confidential for that team."); A254 ("Q. And again, what, if any, usefulness would this document have to someone not on the KPMG U.S. team? A. None that I could see, given the specific nature of the information.").

On cross examination, Rodriguez confirmed again that inspection information "within our inspection teams and how we discuss that" information is "confidential" under both the policy and practice of the PCAOB. A277-78; *id.* ("All of what we are doing [that] is part of planning is confidential and we reinforce within our teams, that our team discussions are confidential."). She also confirmed that this confidentiality obligation even prohibited disclosures to "people within the PCAOB," because members of one team are not permitted to

discuss upcoming inspections with another team. *Id.* No evidence contradicted Rodriguez on this issue.

Nor did the Government introduce evidence establishing that Wada was entrusted with the information that the PCAOB planned to inspect a bank in Switzerland and Japan. For instance, the Government never called a PCAOB witness to testify about the contours of Wada's authorization to access planning information. The Government's direct examination of Rodriguez and Sweet provided some *general* information about PCAOB confidentiality rules and authorizations, but that evidence was never specifically tied to Wada. To the extent that this testimony suggested anything about Wada's authorized access, it suggested that he was *not* entrusted with the information he allegedly leaked because he did not "play any part in the inspection planning process for KPMG." A294.

It was not until after the Government rested its case (A559), during a later discussion about the jury instructions, that the Government seemed to become aware of the entrustment element. When the district court asked the Government to comment on defense counsel's argument about entrustment, the Government responded that it "didn't know this was frankly going to be an issue until today, so I think we would like to [have] a chance to take a look at the law and maybe put in a letter." A567.

2. After scouring the record, the Government argued in its post-trial briefing that the entrustment element was satisfied because, even though Wada "was not on the KPMG U.S. inspections team," a "jury could infer that Wada had access to KPMG's inspection information on [the computer system] given his role on the inspections of KPMG's international affiliate." Dkt. No. 353 at 30. That *post hoc* theory is entirely unfounded.

The best evidence of entrustment that the Government could find was a single vague statement by Rodriguez at the end of the following colloquy:

> Q. Who had access to the GNF Planning Profile in [the computer system]?
>
> A. At that time it was members of the engagement team current and past and certain members of national office or people throughout the organization, where they deemed it necessary for them to have access.
>
> Q. Would that include someone who was just helping out on one particular KPMG inspection but wasn't part of the KPMG team?
>
> A. *They would get a certain amount of access given to them so that way they could document their inspection, yes.*

A231 (emphasis added).

That testimony is far too vague to provide much proof of anything. As an initial matter, the statement does not provide any evidence specifically about Wada and the access that *he* had. The Government never asked, nor did Rodriguez explain, what "a certain amount of access" entailed or who exactly received it.

Nor is it clear how someone would have "a certain amount of access" to a spreadsheet like a GNF Planning Profile. What does that mean? It cannot mean that the employee was able to view but not edit the document because Rodriguez said the reason for the limited access was to "document their inspection." Did the "certain amount of access" even allow the person to view the entirety of the planning spreadsheet, or just the portions in which inspection work would be documented? Moreover, if the reason for the access was to "document their inspection," the access would presumably occur during the inspection and thus long after the inspection selection had been officially announced to the audit firm. Finally, that rationale would not apply to Wada because his role inspecting *KPMG-Japan* would not be documented in the GNF Planning Profile for *KPMG-U.S.*, which did not include any of KPMG's international affiliates. A234-35.

Whatever Rodriguez meant, that single vague statement can hardly override her more detailed and repeated testimony that KPMG-U.S. inspection information was kept confidential from other PCAOB employees—like Wada—who were *not* on the team.[2]

---

[2] The Government also pointed to an excerpt from Sweet's testimony to support its entrustment argument. *See* Dkt. No. 353 at 30 (citing A364). Sweet testified that Holder told him "that Jeff [Wada] was going to be able to explain that he had had [sic] access to this, the KPMG's IIS system, it was kind of restricted access . . . [b]ecause of a role that he had on the firm that . . . required him to be aware of what other schedules existed." A364. If anything, Sweet's testimony

3. Unable to find evidence that Wada was entrusted with the KPMG-U.S. information, the Government also argued that Wada's mere access to the information was sufficient. The Government pointed to the PCAOB's entry logs to show that Wada did in fact log on to the system on the days that confidential information was leaked. Dkt. No. 353 at 30. Thus, Wada was able to "access" the information—and according to the Government, such access is equivalent to entrustment. *Id.* at 29-30. The district court agreed with that view, concluding that Wada was "entrusted" with the KPMG-U.S. information "irrespective of company policies about proper use of and access to the information." SPA31-32.

That analysis is mistaken. *Of course* it matters whether company policy authorizes or forbids an employee from accessing the relevant property when assessing the entrustment element. That is the very issue that distinguishes embezzlement from theft. If the defendant's access to property is unauthorized, then that property was plainly not entrusted to him. And, if mere access were equivalent to entrustment, virtually every successful theft would also be an embezzlement and fraud. Such a rule would bear no relation to the concept of "fraud."

---

confirms that Wada knew he was *not* authorized to access the KPMG-U.S. inspection information so he needed an excuse to explain why he had done so. Such testimony about Wada's purported after-the-fact alibi proves nothing about whether the PCAOB actually entrusted him with the information.

Federal and state courts have consistently rejected the notion that *mere access* to property is equivalent to lawful *entrustment* with that property. In *United States v. Selwyn*, for example, the Eighth Circuit reversed the conviction of a maintenance clerk who had been convicted of embezzling mail in violation of 18 U.S.C. § 1709. 998 F.2d 556, 557-58 (8th Cir. 1993). That statute created two distinct offenses: "The first clause of the section makes it a crime for postal employees to embezzle mail; the second clause makes it illegal to steal the contents of mail." *Id.* at 557. The indictment had only charged the former offense.

The Eighth Circuit reversed the conviction because the district court had ignored the "threshold requirement" of embezzlement—that the "initial possession be lawful." *Id.* Moreover, the Court emphasized that "[l]awful possession is not created by 'mere access' to an item to be taken," and thus the mere fact that the maintenance clerk had "access" to the mail by virtue of his employment was insufficient to establish entrustment. *Id.* at 557-58 (citation omitted).

The Fifth Circuit has likewise enforced the distinction between entrustment and access. In *United States v. Sayklay*, the defendant had been a bookkeeper at a bank, which gave her "access to other bank employees' account numbers, to a check-encoding machine, and to blank counter checks." 542 F.2d 942, 943 (5th Cir. 1976). She used that information to cash fraudulent checks under the names of other employees. *Id.* The bank found out, and the bookkeeper was convicted on

five counts of embezzlement in violation of 18 U.S.C. § 656. *Id.* On appeal, the Government argued that the defendant had been entrusted with the stolen funds because her employment at the bank gave her special *access* to them. *See id.* at 944.

The Fifth Circuit rejected that argument, holding that a mere grant of "access" is not equivalent to entrustment: "Unlike funds in possession of a bank president or a teller, the funds [the defendant] stole were not entrusted to her in any capacity whatever for the use and benefit of the bank." *Id.* Absent such initial entrustment, the defendant could not be guilty of embezzlement. And while the Court acknowledged the bookkeeper's "wrongful actions," it refused to uphold the conviction because doing so "would confuse the distinction that Congress clearly drew between embezzlement and other forms of conversion." *Id.*; *see also United States v. Martinez*, 73 F. App'x 702, 705 (5th Cir. 2003) (applying *Sayklay* to reverse embezzlement conviction).

Because fraud is traditionally the province of state law, numerous state supreme court opinions have similarly addressed the entrustment element of embezzlement, and they have likewise rejected the false equivalence between access and entrustment. As just one example, in *Batin v. State*, the Nevada Supreme Court reversed the embezzlement convictions of a slot-machine mechanic who worked at the Nugget Casino in Sparks, Nevada. 38 P.3d 880, 882 (Nev.

2002). The defendant's duties related to fixing jammed coins and refilling the coin "hopper;" he had no duties related to the "bill validator" component of the slot machine that accepts cash—indeed, he was told that the validator "wasn't to be touched." *Id.* After it came to light that the defendant had been stealing cash from the bill validator while conducting his repairs, he was convicted on three counts of embezzlement. *Id.* at 882-83.

The Nevada Supreme Court reversed the convictions because the State had failed to prove "the element of entrustment," which is the "key distinguishing element of the crime of embezzlement." *Id.* at 883. Like the Eighth and Fifth Circuits, the Court emphasized that proving "a defendant was given mere access to the property converted is insufficient" to establish entrustment. *Id.* at 883-84. The Court noted that individuals are often "entrusted with access to a particular place or thing without being given dominion and control over the property therein." *Id.* And that conditional form of access is all that the Nugget Casino had entrusted to the mechanic when it allowed him to repair the slot machines but forbade him from touching the bill validator. *Id.*[3]

---

[3] Other federal and state courts likewise continue to enforce the entrustment element of embezzlement. *See, e.g.*, *OneSky Litig. Tr. v. Sullivan*, No. 10-cv-344-LM, 2012 WL 124739, at *14 (D.N.H. Jan. 17, 2012); *State v. Weaver*, 607 S.E.2d 599, 605 (N.C. 2005); *State v. Taylor*, 378 P.2d 352, 353-54 (Utah 1963); *State v. Kovach*, 143 P.3d 192, 195-96 (N.M. Ct. App. 2006).

For all these reasons, a defendant's "mere access" to the property is insufficient to establish entrustment. *Selwyn*, 998 F.2d at 557 (citation omitted). "Access" is a particularly inappropriate proxy for entrustment when, as here, the evidence demonstrated that Wada was *prohibited* from accessing the information at issue.

### C. The Failure To Prove Entrustment Requires Full Reversal

The Government's failure of proof requires reversal of all three convictions. As noted above, courts have not hesitated to dismiss fraud charges when the evidence established theft, not embezzlement. They have done so because "[m]ore is at stake here than convicting a wrongdoer of something: fidelity to Congress' clear purpose and refusal to convict anyone of a crime of which he has not been and cannot be, on the facts proved guilty." *Sayklay*, 542 F.2d at 944.

Here, the two substantive wire fraud counts—which alleged fraud in connection with 2016 and 2017 inspections lists—must be reversed because the Government failed to establish the required element of embezzlement. *See* A123; A778 (Jury Charge). For the same reason, the Government's failure of proof also requires reversal of Wada's conviction for conspiracy to commit wire fraud under 18 U.S.C. § 1349. *See United States v. Novod*, 927 F.2d 726, 728 (2d Cir. 1991) (reversing conspiracy conviction because mail and wire fraud convictions had been reversed). The Government presented no evidence showing that Wada made any

agreement with Holder or the other KPMG employees to embezzle confidential PCAOB information.

At a minimum, Wada's conspiracy conviction should be vacated and remanded for a new trial because that count was undoubtedly affected by "prejudicial spillover" from the two substantive wire fraud counts. Such prejudicial spillover creates a "retroactive misjoinder" when the "joinder of multiple counts was proper initially, but later developments—such as . . . an appellate court's reversal of less than all convictions—render the initial joinder improper." *United States v. Hamilton*, 334 F.3d 170, 181 (2d Cir. 2003) (quoting *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994)); *see also United States v. Vebeliunas*, 76 F.3d 1283, 1293-94 (2d Cir. 1996).

"Prejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal" warrants a new trial when the defendant shows "compelling prejudice." *Jones*, 16 F.3d at 493; *see Vebeliunas*, 76 F.3d at 1293. In the context of this case—where a jury convicts a defendant of conspiracy to commit substantive offenses, in the absence of a legally sufficient evidence of those underlying offenses—the risk of such prejudice is at its zenith. Indeed, this Court has emphasized that this interplay between substantive counts and a conspiracy count creates "a substantial risk of prejudicial spillover" and supports a new trial. *United States v. Scotti*, 47 F.3d 1237, 1247 (2d Cir. 1995). "Common

sense and experience tell us that it is more likely that the jury will find a defendant guilty of conspiracy if it also finds him guilty of the substantive offense that is the object of the conspiracy." *Id.*

That is precisely what happened here. The jury's erroneous conflation of theft and embezzlement with respect to the substantive fraud counts necessarily infected its assessment of the conspiracy count. After all, the substantive counts necessarily encompassed an agreement to pass the confidential PCAOB information to the KPMG employees—precisely the same conduct supporting the conspiracy charge. In these circumstances, it would have been impossible for a rational jury to have *acquitted* Wada of the wire fraud conspiracy while simultaneously *convicting* him of the underlying fraud. The prejudice flowing from the jury's improper assessment of the substantive counts is clear and undeniable.

* * *

None of the foregoing suggests that misappropriating PCAOB confidential information is ethical or appropriate. But the question is not whether Wada acted appropriately; rather, it is whether his conduct constitutes the federal crime of wire fraud. Because Wada was not entrusted with the information, he did not embezzle it, and there was no fraud. His convictions must therefore be overturned.

## II. THE PCAOB'S INSPECTION SELECTIONS ARE NOT PROPERTY UNDER THE WIRE FRAUD STATUTE

Wada's convictions must also be reversed because information about the PCAOB's inspection selections does not constitute "property" under the wire fraud statute. Such information has never been recognized as property at common law, and it does not qualify as such under the precedent of the Supreme Court or this Court.

### A. The Wire Fraud Statute Is Limited To Traditional Forms Of Property

Federal law does not criminalize fraud simpliciter. Rather, the federal fraud statutes are carefully limited by either the means, object, or victim of the fraud. *See, e.g.*, 18 U.S.C. § 1030 (computer fraud); *id.* § 1344 (bank fraud); *id.* § 371 (conspiring to defraud the United States). *See* Ellen S. Podgor, *Criminal Fraud*, 48 Am. U. L. Rev. 729, 730-31(1999). As relevant here, the wire fraud statute prohibits knowingly using wire communication to obtain "*money or property*" by fraudulent means. 18 U.S.C. § 1343 (emphasis added).

Since 1987, the Supreme Court has issued a series of rulings strictly enforcing the statute's property limitation. In *McNally v. United States*, the Court made clear that the mail fraud statute is "limited in scope to the protection of property rights." 483 U.S. 350, 360 (1987). As the Court later explained, "[a]t the time *McNally* was decided, federal prosecutors had been using [the mail fraud

statute] to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property," such as the intangible right to honest government services. *Cleveland v. United States*, 531 U.S. 12, 18 (2000). The *McNally* decision "stopped the development of the intangible-rights doctrine in its tracks" and required prosecutors to honor the property limitation imposed by Congress. *Skilling v. United States*, 561 U.S. 358, 401 (2010).[4]

Since *McNally*, the Supreme Court has continued to emphasize that the property limitation is *not* an invitation to innovate new legal theories about what constitutes "property." Quite the opposite. As the Court explained in *Carpenter*, the object of the fraud must be something that has "*long been recognized* as property." 484 U.S. at 25-26 (emphasis added). In *Carpenter*, the property in question was the *Wall Street Journal*'s confidential business information—specifically, "the publication schedule and contents" of a column that had the potential of affecting stock prices. *Id.* at 25. To determine whether such information constituted "property" under the mail and wire fraud statutes, the Court relied on historical cases, statutes, and legal treatises to confirm that confidential business information of that sort—the "stock in trade" of a

[4] *McNally* addressed the mail fraud statute, 18 U.S.C. § 1341, but because the mail and wire fraud statutes "use the same relevant language, they are analyzed the same way." *United States v. Trapilo*, 130 F.3d 547, 551 n.7 (2d Cir. 1997) (citation omitted).

newspaper—falls within the traditional concept of property. *Id.* at 26 (citation omitted). That historical pedigree distinguished the *Wall Street Journal*'s confidential information from the purported property interest in *McNally*, which it described as the "ethereal" right to the "honest and faithful service" of a government employee. *Id.* at 25.

In *Cleveland*, the Supreme Court again emphasized that the mail and wire fraud statutes may not be interpreted to extend beyond "traditional concepts of property." 531 U.S. at 24. There, the Government had argued that a state's unissued video poker licenses constituted "property" because they were economically valuable and because, like a patent, they involved the "right to exclude." *Id.* at 21-23. Although the Supreme Court did not dispute that the licenses were valuable and implicated the right to exclude, the Court nonetheless rejected the Government's argument because, "far from composing an interest that 'has long been recognized as property,' these intangible rights of allocation, exclusion, and control amount to no more and no less than [the state's] sovereign power to regulate." *Id.* at 23 (quoting *Carpenter*, 484 U.S. at 26).

In more recent cases, the Supreme Court has continued to insist upon that historical analysis to enforce the property limitation in the mail and wire fraud statutes. *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (conducting historical analysis to conclude that the right to excise taxes "has long

been thought to be a species of property"); *see also Skilling*, 561 U.S. at 402 (noting that mail fraud statute is "limited in scope to the protection of property rights" (citation omitted)). Wada thus cannot be convicted of fraud unless the confidential government information at issue here falls within the traditional understanding of property.

### B. Confidential PCAOB Information About Inspection Selections Is Not A Traditional Form Of Property

Information about the PCAOB's inspection selections—and confidential government information bearing on the government's regulatory interests more generally—cannot satisfy the wire fraud's property requirement because it is not a traditional form of property. That type of information was not historically treated as "property," nor does it qualify as such under this Court's recent decision in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019). In *Blaszczak*, the Court applied a fact-intensive analysis to conclude that some forms of confidential government information—there, an agency's predecisional regulatory information—may constitute property under the wire fraud statute. *See id.* at 26, 34. For the reasons identified in Judge Kearse's forceful dissent, *Blaszczak*'s holding is erroneous and should be overturned. But even under *Blaszczak*, information about the PCAOB's upcoming inspections, unlike information about an agency's forthcoming rule or regulation, is not property within the meaning of the wire fraud statute.

1. In *Blaszczak*, the defendants were convicted of violating the wire fraud statute, among other crimes, by misappropriating confidential information from the Centers for Medicare & Medicaid Services (CMS), and then passing that information through an intermediary to a healthcare-focused hedge fund that traded on the information. *See id.* at 26-28. The nature of the confidential government information was substantive and detailed. As just one example, the Court noted that the defendants had passed along "nonpublic CMS information concerning both the timing and substance of an upcoming proposed CMS rule change that would reduce the reimbursement rate for certain radiation oncology treatments." *Id.* at 27. The defendants then made millions of dollars trading on that information.[5]

On appeal, the defendants argued that confidential government information can never constitute property under the wire fraud statute. *See Blaszczak* Br. for Def.-Appellant Robert Olan 20, No. 18-2811 (2d Cir. Mar. 5, 2019), ECF No. 129. Unlike the proprietary nature of the confidential *business* information at issue in

[5] In another instance, one of the defendants passed along inside information about CMS's proposed cut to the "reimbursement rate for end-stage renal disease . . . treatments by 12 percent"—information that allowed the defendant to know both the timing and substance of the forthcoming public announcement, and thereby short the stock of a company that would be hurt by the rate cut. *See Blaszczak*, 947 F.3d at 27-28. In yet another example, the defendants misappropriated and traded on ongoing deliberative information at the same time that CMS officials "were working on the rule." *Id.* at 28 (citation omitted).

*Carpenter*, the defendants maintained that confidential *government* information is inherently regulatory in nature under the logic of *Cleveland*. *Id.* at 19-26.

*Blaszczak* rejected that categorical rule. It held instead that certain "confidential government information such as the CMS information at issue here *may* constitute 'property' in the hands of the government" for purposes of the wire fraud statute. 947 F.3d at 26 (emphases added); *see also id.* at 34. The Court reached that conclusion by assessing the particular characteristics of the purported property in light of the "permissible considerations" outlined in Supreme Court precedent, including the value of the information; the extent to which it implicated the right to exclude; and the economic loss associated with its dissemination. *Id.* at 31-33 (citation omitted). The Court emphasized that those factors do not establish "rigid criteria for defining property." *Id.* at 32-33 (quoting *Fountain*, 357 F.3d at 256); *see also id.* at 34.

2. *Blaszczak*'s reasoning and holding are incorrect, as Judge Kearse detailed in her compelling dissent. *See id.* at 45-49. As she explained, CMS's confidential regulatory information is fundamentally different than the confidential business information at issue in *Carpenter* because "CMS is not a business; it does not sell, or offer for sale, a service or a product; it is a regulatory agency." *Id.* at 47. As such, CMS's regulatory information is not its "stock in trade" analogous to prepublication news for a newspaper. *Id.* For these reasons, Judge Kearse

concluded that CMS had not been "deprived of anything that could be considered property." *Id.* at 48.

*Blaszczak* also entirely failed to undertake the historical inquiry mandated by Supreme Court precedent. Unlike *Carpenter*, for instance, *Blaszczak* cited no historical cases, statutes, or treatises to establish that confidential *regulatory* information "has long been recognized as property." 484 U.S. at 26. Had it conducted such an inquiry, it would have come up empty handed because confidential regulatory information has virtually never been regarded as "property."[6]

*Blaszczak* also disregarded the relative weight that the Supreme Court afforded to certain property characteristics in *Cleveland*.[7] *Blaszczak* concluded

[6] To be sure, a narrow subset of confidential government information could qualify as traditional property, such as any confidential intellectual property owned by the Government. But nothing of the sort is alleged here. The simple truth is that relatively few *intangible* interests have "long been recognized as property." *Carpenter*, 484 U.S. at 26. Instead, most traditional concepts of property involve *tangible* items, such as real property like land, and personal property like chattels and goods.

[7] *Blaszczak* even strangely suggested that *Cleveland* had little effect on the "existing legal landscape," 947 F.3d at 32, despite the fact that the Supreme Court relies on *Cleveland* quite frequently (even more so than *Carpenter*). Recently, the Supreme Court even relied on *Cleveland* to reject novel theories of intangible government "property" under other statutes. *See Sekhar v. United States*, 570 U.S. 729, 737 (2013); *see also id.* at 740-41 (Alito, J., concurring in the judgment) ("Our decision in *Cleveland v. United States*, 531 U.S. 12 (2000), supports the conclusion that internal recommendations regarding government decisions are not property.").

that CMS had an economic interest in its confidential information in part because it "invests time and resources" in maintaining that information. 947 F.3d at 33. But in *Cleveland*, the Supreme Court rejected the notion that such incidental costs (there, the cost of processing licenses) were "sufficient to establish a state property right." 531 U.S. at 22. The contrary theory embraced by *Blaszczak* is so untenable that the Government recently abandoned it during oral argument before the Supreme Court. *See* Transcript of Oral Arg. at 63, *Kelly v. United States*, No. 18-1059 (Jan. 14, 2020) (Government: "Incidental uses of property that are not the object of the scheme are not going to be sufficient for property fraud."); *id.* ("[T]hey're not committing property fraud just because some employee needs to spend some time processing the license."). Given these flaws, *Blaszczak* should be overturned, either by this Court or the Supreme Court.[8]

3. Even setting aside *Blaszczak*'s errors, neither its holding nor reasoning supports the Government's claim that the PCAOB's inspection information is property under the wire fraud statute. To reiterate, *Blaszczak* did *not* hold that all confidential government information is property. In fact, it expressly disavowed

---

[8] Several of the *Blaszczak* defendants are currently seeking panel rehearing or rehearing *en banc*, *see* No. 18-2811, ECF Nos. 277, 280, 282, and the Supreme Court's disposition of a pending case may undermine *Blaszczak* as well, *see Kelly v. United States* (No. 18-1059) (likewise addressing meaning of "property" under the fraud statutes). If necessary, Wada will request the opportunity to present supplemental briefing based on intervening developments.

any "rigid" analysis that would simply lump together all forms of confidential information and label them "property." *See* 947 F.3d at 32 (citation omitted).

*Blaszczak* was right to reject such a categorical approach. Given the far-reaching nature of workplace confidentiality rules, it is certain that some government and business information designated "confidential" is not proprietary. For instance, at the PCAOB, all information is considered either "public" or "nonpublic," and nonpublic information consists of "any information obtained in the course and scope of . . . employment and which has not been released, announced, or otherwise made available publicly." A498-99. And *all* nonpublic information, no matter how inconsequential, is deemed "confidential." A500 (stating that there is no "materiality threshold" for what types of nonpublic information is confidential). Under a categorical approach to confidential information, the PCAOB would own, as property, every trivial piece of information that is nonpublic—including such things as workplace gossip or mundane administrative information. At trial, a PCAOB Ethics Officer even confirmed that it would violate PCAOB confidentiality rules to disclose that "the PCAOB office in Fort Lauderdale increased its copy paper order for the month." A500.

The question is therefore not whether the PCAOB inspection information was confidential, but rather whether that information shares sufficient similarities

to the information at issue in *Blaszczak* and at common law such that it is proprietary. To answer that question, *Blaszczak* required a fact-intensive analysis of the specific government information at issue. Conducting that inquiry here shows that information about the PCAOB's inspection selections is fundamentally different than the predecisional CMS information in *Blaszczak*. Indeed, there is no good reason to extend *Blaszczak* to this particular form of confidential information, which is even farther from the heartland of traditional property and even closer to pure regulatory information.

Unlike the CMS information in *Blaszczak*, the confidential information in this case was predominantly logistical information related to upcoming events; it did not reflect the agency's substantive work product. Wada's alleged early disclosure related to the selection and timing of upcoming PCAOB actions—at bottom, it was administrative information. There was no allegation that Wada disclosed any substantive predecisional information about forthcoming PCAOB rules relating to auditing, quality control, or ethical standards. *See* 15 U.S.C. § 7213. Nor did Wada disclose any substantive deliberative information about the PCAOB's assessment of KPMG or any of its individual engagements. The

information was who would be inspected and when—not the PCAOB's substantive analysis or work product.[9]

*Blaszczak*'s assessment of confidential information must also be understood in light of *Carpenter*. When assessing whether the Wall Street Journal's confidential news information constituted property, *Carpenter* turned to two types of proprietary information that have been traditionally recognized at common law: (1) trade secrets; and (2) confidential information that is readily monetizable through securities transactions. *See* 484 U.S. at 25-26. The information in *Carpenter* shared features with *both* categories.

*First*, *Carpenter* relied on cases and a treatise that addressed trade secrets as a form of property. *Id.* at 26 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984); *Bd. of Trade of the City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-51 (1905); 3 W. Fletcher, *Cyclopedia of Law of Private*

[9] *Blaszczak* itself recognized a similar distinction when describing the nature of the CMS information—it was "information concerning both the *timing* and *substance* of an upcoming proposed CMS rule change." 947 F.3d at 27 (emphasis added); *see also supra* note 5. The *Blaszczak* Court likely acknowledged that combination of both administrative and substantive information because the Supreme Court did the same when discussing the proprietary nature of the confidential business information in *Carpenter*. *See* 484 U.S. at 25 (describing the Wall Street Journal's property as "confidential business information—the publication schedule and contents" of its column); *id.* at 23 (similar); *id.* at 24 (similar); *id.* at 25 (similar). *Carpenter*'s repeated coupling of both administrative and substantive information matters because, once uncoupled, administrative information on its own is too far afield from any traditional concept of property.

*Corporations* § 857.1 (rev. ed. 1986)). In *Ruckelshaus*, for instance, the Supreme Court had held that a company's "trade secrets," despite their "intangible nature," may constitute property. 467 U.S. at 1003. To reach that conclusion, *Ruckelshaus* relied on the Restatement of Torts § 757, which defines a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement (First) of Torts § 757 cmt. b (1939)). It goes on to note, however, that a trade secret "*differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business*," but rather is "a process or device for continuous use in the operation of the business." *Id.* (emphasis added).

*Carpenter*'s reliance on traditional trade secret law illustrates some of the features that can transform confidential information into a property right. One such feature is whether the confidential information relates to "single or ephemeral events in the conduct of business," or instead if it will be put to "continuous use." *Id.* That distinction makes sense and helps explain why the PCAOB's inspection information, unlike the information in *Blaszczak*, lacks sufficient parallels to trade secrets and does not share its proprietary status. Unlike confidential information about an agency's substantive work product—forthcoming rules and regulations—confidential information about the PCAOB's upcoming inspections relates only to

"single or ephemeral events." It is not an intellectual work product that can endure and continue providing value to its owner, and does not constitute the agency's "stock in trade." *See Carpenter*, 484 U.S. at 26 (citation omitted). Instead, that information is valuable only for one-time use, it is always intended to be disclosed, and whatever value it has entirely dissipates upon disclosure. It is hard to imagine an interest more "ethereal" than that. *See id.* at 25.

*Second*, *Carpenter* also relied on a case and treatise that acknowledged that, in the securities-trading context, confidential business information may constitute property. *Id.* at 26 (citing *Dirks v. SEC*, 463 U.S. 646, 653 n.10 (1983); *Cyclopedia of Law of Private Corporations* § 857.1). As with trade secrets, this traditional form of proprietary information helps illustrate what can turn confidential information into property. When confidential information provides a basis on which to trade securities, as it did in *Carpenter* and *Blaszczak*, that generally shows that the information is substantive in nature. And that provides a first-line distinction between such information and less weighty confidential information, such as an increase in the "copy paper order." A500. Moreover, when information is used for making trading decisions, that directly establishes the information's monetary value. In *Blaszczak*, for instance, the defendants made millions of dollars by trading. *See* 947 F.3d 26-28. Here, there is no allegation that the PCAOB's inspection information could provide a basis on which to initiate

securities transactions. Nor is there an allegation that Wada, KPMG, or anyone else received or paid any money whatsoever for the information that he allegedly leaked.

In sum, the PCAOB's inspection information does not constitute property under *Carpenter*, *Blaszczak*, or any traditional notion of property. *Carpenter* and the common law recognized the proprietary nature of two forms of confidential information: trade secrets and confidential information that provides a basis for securities trading. Since *Carpenter*, this Court has never extended the types of proprietary confidential information beyond those two limited categories.[10] This case should not be the first.

4. Extending *Blaszczak* to include the confidential information at issue here—information about timing and future actions—would dramatically expand the power of prosecutors to arbitrarily charge everyday occurrences as federal fraud. The Supreme Court has denounced an interpretative approach that would allow such a result: "[W]e cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell v. United States*, 136 S. Ct. 2355, 2372-73 (2016) (quoting *United States v. Stevens*, 559 U.S. 460, 480

[10] Counsel has used the Westlaw database to review every decision of the Supreme Court and this Court citing *Carpenter*. None of those decisions uphold a wire fraud conviction where the asserted "property" was a form of confidential information that does not fall within one of these two categories.

(2010)). Doing so here would be especially inappropriate, because it would allow prosecutors to censor speech at the heart of democratic accountability and self-governance. It would expose government whistleblowers—and *any* government officials who speak to the press without authorization—to prison sentences of up to twenty years. And given how all-encompassing government confidentiality rules tend to be, and how often technical violations occur, it would lay the groundwork for arbitrary and unfair prosecutions.

Technical violations of government or workplace confidentiality requirements are commonplace. Consider a police officer who warns his neighbor that the police department will be strictly enforcing the speed limit on a particular street the following week. While such an unauthorized disclosure might violate department policy, neither the officer nor the neighbor who acts on that confidential information (by scrupulously following the speed limit) has defrauded the local government of "property." Or consider an agency employee who speaks to a reporter about internal agency deliberations, without authorization. Such conduct is essential to keeping the public informed on important matters, and it occurs *all the time*. No one has ever believed it to be a federal fraud crime—until now. If Congress really wants to outlaw this sort of conduct, "it must speak more clearly than it has." *McNally*, 483 U.S. at 360; *see also Cleveland*, 531 U.S. at 24.

Extending *Blaszczak* to the type of confidential government information at issue would also undercut the comprehensive statutory framework that Congress has already established to address the precise issue alleged here: unauthorized disclosures of government information. Although not addressed by *Blaszczak*, Congress has spent years carefully fine-tuning a reticulated statutory framework governing how and when government leaks may be criminally prosecuted. These statutes are deliberately calibrated to account for *who* disclosed the confidential government information; the precise *nature* of the information; and the *purpose* of the disclosure. *See, e.g.*, 18 U.S.C. § 793 (confidential information about the national defense), *id.* § 794 (confidential defense information to aid a foreign government); *id.* § 798 (classified government information).[11] Notably, the general statute governing the unauthorized disclosure of government information provides a maximum prison sentence of one year, *id.* § 1905, as compared with the 20-year maximum authorized under the wire fraud statute, *id.* § 1343.

Here, the district court's ruling replaces Congress's surgical precision with a hacksaw. If allowed to stand, that decision will open the door for arbitrary prosecutions targeting everyday occurrences. Moreover, it will subvert Congress's judgment on how and when to prosecute government leaks in an area that raises

[11] *See also* 50 U.S.C. § 783(a) (classified national security information to a foreign government); 18 U.S.C. § 1030(a)(1) (national defense or foreign relations information accessed through a computer without authorization).

unique concerns about democratic governance and First Amendment protections. *Cf. United States v. Truong Dinh Hung*, 629 F.2d 908, 927 & n.21 (4th Cir. 1980) ("It would greatly disrupt the network of carefully confined criminal prohibitions Congress thought it had enacted . . . if the courts permitted § 641 to serve as a criminal prohibition against the merely willful unauthorized disclosure of any classified information.").

Finally, even if the Court finds it ambiguous whether the wire fraud statute criminalizes schemes aimed at confidential—but non-substantive—regulatory information, the rule of lenity would require adopting a narrower construction. The Supreme Court has repeatedly invoked that rule to explain its rejection of the Government's sweeping property theories in other fraud cases. *See, e.g.*, *Skilling*, 561 U.S. at 410-11; *Cleveland*, 531 U.S. at 25 (stating that the rule of lenity is "especially appropriate in construing § 1341"); *McNally*, 483 U.S. at 359-360 ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."). The rule of lenity forecloses the Government's expansive property theory here as well.

* * *

The wire fraud statute has been in force for over a half century. Until several months ago, no court had ever held that confidential government

information constitutes "property" under the statute. *Blaszczak* changed that. But its holding was narrow, limiting its property determination to confidential information "such as the CMS information at issue here." 947 F.3d at 26. Information about the selection of upcoming inspections is fundamentally different. The Court should decline the Government's invitation to expand *Blaszczak* to cover a wide swath of additional conduct.

## III. THE GOVERNMENT'S IMPROPER REBUTTAL DEPRIVED WADA OF A FAIR TRIAL

The Government's improper remarks during the rebuttal summation provide yet another reason why Wada's convictions cannot stand. Prosecutorial misconduct during closing arguments warrants a new trial upon a showing "(1) that the prosecutor's statements were improper and (2) that the remarks, taken in the context of the entire trial, resulted in substantial prejudice." *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) (quoting *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir. 1994)). Both of those requirements are satisfied here.

### A. The Government's Remarks During Rebuttal Were Improper

The Government's argument during the rebuttal summation was improper in three main ways. First, the prosecutor improperly vouched for the credibility of its key witness, Brian Sweet—a plain violation of this Court's precedent. *See Aquart*, 912 F.3d at 36. Second, the prosecutor told the jury how certain key individuals—federal agents and PCAOB employee Bob Ross—*would have* testified if they had

been witnesses during the trial. Such statements are prohibited by blackletter law. *See id.* Third, the prosecutor inaccurately criticized the defense for making arguments in the alternative. That criticism mischaracterized the defense, improperly shifted the burden of proof, and again, blatantly contravened this Court's precedent. *See id.* at 41-42.

1. This Court has made clear that prosecutors may not vouch for the credibility of Government witnesses. *See United States v. Melendez*, 57 F.3d 238, 240 (2d Cir. 1995) (collecting cases). Several different rationales underlie that prohibition. For one, vouching "'impl[ies] the existence of extraneous proof,' available to the government but not to the jury, which gives the former an advantage in assessing credibility." *Aquart*, 912 F.3d at 36 (quoting *Perez*, 144 F.3d at 210 (alteration in original) (citation omitted); *see also United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012); *Melendez*, 57 F.3d at 240-41. Vouching is also prohibited because "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Melendez*, 57 F.3d at 240-41 (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)).

This Court has "regularly condemned" efforts by prosecutors to vouch for witnesses. *Id.* at 240. For instance, in *United States v. Certified Environmental Services, Inc.*, the "prosecutor personally vouched for the truthfulness of the[]

witnesses," who were testifying under cooperation agreements, by "stating that 'the immunity agreements are very simple. *We wanted to ensure that people taking the stand provided the truth*.'" 753 F.3d 72, 87 (2d Cir. 2014) (emphasis added) (citation omitted). On appeal, the Government "concede[d]" that this statement "constituted impermissible vouching." *Id.* at 87-88. A federal agent had also testified at the trial, and during the rebuttal summation, the prosecutor suggested that the prosecution team knew the agent was reliable. *Id.* at 87, 97. On appeal, the Government "concede[d]" that this statement also "constituted impermissible vouching." *Id.* at 94-95. This Court, for its part, found the prosecutor's statements "particularly egregious" because they occurred during the rebuttal summation, "when defense counsel no longer has an opportunity to reply." *Id.* at 94.

Despite this well-established prohibition, the prosecutor in this case unequivocally vouched for Sweet's credibility during the rebuttal summation. That bolster was essential to rehabilitating Sweet's credibility. After all, Sweet was the Government's most important witness *by far*—and the only one who linked Wada to the alleged scheme. The defense had argued, in essence, that Sweet was not credible because of his repeated lies, criminal conduct, and inconsistent testimony. A730-37. The defense had further argued that Sweet's regular contacts with multiple PCAOB employees (whom he admitted probing for information)

presented equally plausible leakers that could not be ruled out by Sweet's say-so alone.[12] But Sweet decided to point the finger at Wada (and Holder) instead of the others. *See* A731-35. Sweet had obtained a cooperation agreement with the Government based on that story-line, and defense counsel argued he would cling to it to save his skin. *See* A725-30. Thus, the issue of Sweet's credibility cut to the heart of the trial because his testimony provided the only linchpin that could possibly hold together the Government's theory of the case. Trusting Sweet was absolutely essential to any theory of Wada's guilt.

Against that backdrop, the Government set out in the rebuttal summation to rehabilitate Sweet's credibility and the reliability of its investigation. The prosecutor started off fairly enough by arguing that Sweet's story made sense in light of the evidence. *See* A757-59. That approach to rehabilitating a witness is permissible. But it was not persuasive. So the prosecutor went further.

The prosecutor assured the jury that the "government has not been fooled by Brian Sweet." A761. In case the jury missed that governmental imprimatur, the prosecutor said it again shortly thereafter in even more definitive terms: "*[Y]ou*

---

[12] For example, Sweet admitted (and the evidence corroborated) that Sweet regularly socialized with Bob Ross, a high-level PCAOB banking specialist. *See* A255; A326; A432. Indeed, Sweet had lunch with Ross on the very day he claimed Holder learned from Wada the PCAOB's preliminary *banking* inspection selections for KPMG-U.S. *See* A349-50; A353; A404. The Government's evidence did not attempt to rule out the possibility that Ross was the leaker.

*can believe Sweet because he told you the truth*. This whole idea that Sweet is still committing crimes and still lying about it and still revealing it, that's just not true." A767 (emphasis added). For good measure, the Government repeated the claim once more: "[Sweet] is trying to tell you the truth." A768. It is hard to imagine how the prosecutor could convey to the jury more clearly that Brian Sweet was not like any other witness—he had the Government's stamp of approval.

2. If the Government's imprimatur on Sweet were not enough, the prosecutor also transgressed the other rationale for prohibiting vouching: making claims about evidence outside of the record that supposedly would support the Government's case. *See Aquart*, 912 F.3d at 36. During Wada's summation, defense counsel had pointed out that the Government had presented no evidence ruling out other potential sources of the leak, such as PCAOB employee Bob Ross. *See* A733-34. Nor had the Government set forth any evidence about the extent to which it had investigated such alternative sources of the leak. *See id.* In the rebuttal summation, the prosecutor responded by stating: "This case was investigated thoroughly." A761. And shortly after that stark claim, the prosecutor asserted that, if "Bob Ross" or "the [federal] agents who ran this investigation" had testified, "*you know what that would have shown*: That all roads lead to Jeffrey Wada, that all of the evidence points to Jeffrey Wada." A762 (emphasis added).

It was wholly improper for the prosecutor to make representations about what Bob Ross or the federal agents *would have* testified had they been witnesses, or that the Government had thoroughly investigated this case. *See Certified Envtl. Servs., Inc.*, 753 F.3d at 97 (stating that "the improvisatory nature of a rebuttal summation is no license for improper vouching" or for "referencing facts not in the record"). Doing so sent the jury a clear message that the Government was aware of evidence outside of the record—such as information from Ross and the federal agents—that ruled out other sources and confirmed Sweet's claims about Wada.

3. The Government engaged in additional misconduct during the rebuttal summation by maligning the defense—inaccurately—for making arguments in the alternative. Such prosecutorial remarks, once again, have been squarely denounced by this Court. As *Aquart* explains, attacking defense arguments because they are made in the alternative violates the defendant's Sixth Amendment right to a "meaningful opportunity to present a complete defense." 912 F.3d at 42 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). That right is not limited to advancing "consistent defense theories," but rather "demands that defendants be allowed 'to present wholly inconsistent defenses.'" *Id.* (quoting *United States v. Goldson*, 954 F.2d 51, 55-56 (2d Cir. 1992)). In *Aquart*, the Court found that the Government violated that right when it "urged the jury to draw an adverse inference from the fact that the defense had advanced different theories" at

different stages of the trial. *Id.* The Government urged the jury to do the same here.

During summation, Wada's defense counsel emphasized multiple ways in which the Government had failed to satisfy its burden of proof beyond a reasonable doubt. *See* A731-37; A748-55. At one point, counsel argued that the Government had presented insufficient evidence that Wada was the source of the leaks from the PCAOB. *See* A730-37. Later, counsel argued that the Government had *also* presented insufficient evidence that Wada had knowingly entered a conspiracy to commit fraud. *See* A748-55. Nothing about these arguments was inconsistent—but even if they *had* been inconsistent, the prosecutor may not attack them on that basis. *See Aquart*, 912 F.3d at 42.

Nonetheless, during the rebuttal summation, the Government attacked these arguments as wholly inconsistent. The prosecutor told the jury that defense counsel "said to you, *[that he is] going to try and have it both ways*. Wada is not the leaker, you should think it's someone else; but if he was the leaker, he wasn't trying to improve inspection results, he wasn't trying to target the SEC. That argument doesn't make any sense." A763 (emphasis added). The prosecutor then went on to recast defense counsel's argument using the following highly prejudicial analogy:

> That's like a wife who is walking down the street and she looks in the window of a romantic French restaurant and her husband is having

> dinner with another woman. When he gets home, she says, I just saw you having dinner, and he says, wasn't me, must have been somebody else, but if it was me, it didn't mean anything. That doesn't make sense.
>
> You can't have it both ways. The arguments don't hold together. It doesn't make sense to say that you weren't the source, but if you were the source, you didn't intend to do anything.

A764. That argument was plainly improper and violated the Sixth Amendment's "specific guarantee[]" to present a complete defense, including "wholly inconsistent defenses." *Aquart*, 912. F.3d at 42 (citations omitted). This Court takes "special care" when reviewing such misconduct. *Id.*; *id.* at 69-70 (vacating and remanding because prosecutor "denigrate[d] the defense for pursuing inconsistent theories" and improper vouching). And here, the prosecutor's attack on defense counsel for "try[ing] [to] have it both ways" clearly violated the Sixth Amendment. A763.

Moreover, the argument was improper for two additional, interrelated reasons: It mischaracterized the defense counsel's argument, and it shifted the burden of proof to Wada. The mischaracterization was that the Government characterized the arguments by defense counsel as (1) two arguments for why the evidence was *sufficient* to support Wada's theory of defense, instead of (2) two arguments for why the evidence was *deficient* to support the Government's theory of prosecution. Of course, without that mischaracterization, defense counsel's arguments were not inconsistent at all. The Government had simply failed to meet

its burden in two different ways. Relatedly, the framing of that mischaracterization has the effect of the shifting the burden of proof to Wada. That shift is wholly improper. *See United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990) (prosecutor may not "suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatsoever").

### B. The Government's Improper Remarks Were Highly Prejudicial

The Government's improper remarks during the rebuttal summation substantially prejudiced Wada. Given that prejudice, the Court can have no confidence in the fairness of the proceeding and should order a new trial. *See Aquart*, 912 F.3d at 27; *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002).

In assessing whether a prosecutor's remarks caused substantial prejudice, the Court considers "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *Aquart*, 912 F.3d at 27 (quoting *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012)). All three factors weigh in favor of a new trial.

*First*, the prosecutorial misconduct was serious. Far from a stray off-color remark, the prosecutor's improper vouching was both (1) the kind of flagrant violation that this Court has "regularly condemned," *Melendez*, 57 F.3d at 240, and (2) surgically directed toward the heart of the Government's case—the credibility of Sweet. The same holds true for the prosecutor's testimony about Bob Ross and

the absent federal agents, as well as the prosecutor's attack on defense counsel for making arguments in the alternative. Those comments directly targeted a specific constitutional guarantee that this Court safeguards with "special care." *Aquart*, 91 F.3d at 42 (citation omitted). They also mischaracterized a crucial element of the defense strategy, which was to emphasize the Government's failure to satisfy its burden of proof. The seriousness of this misconduct is further evident because it occurred during rebuttal, which left no opportunity for Wada's counsel to further address the jury.

Nor can the Government's misconduct be excused on the basis that rebuttals carry an air of improvisation. As this Court has made clear, even though rebuttals are not "fully constructed in advance," that provides "no license for improper vouching" or "referencing facts not in the record." *Certified Envtl. Servs., Inc.*, 753 F.3d at 97 (citation omitted). In any event, the Government's rebuttal was hardly delivered on the fly; it was carefully crafted and accompanied by an intricate slide presentation. The Government had an entire evening to prepare its rebuttal argument after listening to Middendorf's summation and the majority of Wada's summation. *See* A744.

*Second*, defense counsel's requests for corrective instructions were denied. The district court stated that the jury charge would be sufficient to cure any improper remarks that had occurred. *See* A766; A771-77. That response was

inadequate. *See Certified Envtl. Servs., Inc.*, 753 F.3d at 87-88, 95, 97 (jury instructions that "included only standard charges on the nature of evidence, the testimony of government witnesses, and the burdens of proof, with no special curative charges" were insufficient to cure the prosecution's "impermissible vouching" and "reference[s] to facts not in evidence"); *see also United States v. Friedman*, 909 F.2d 705, 710 (2d Cir. 1990); *United States v. Modica*, 663 F.2d 1173, 1182 (2d Cir. 1981).

*Third*, in a "close case" such as this, "prosecutorial misstatements take on greater importance, whether those statements are intentional or not." *United States v. Burse*, 531 F.2d 1151, 1155 (2d Cir. 1976). This was a close case—Wada was acquitted of the lead count against him, and only charged in three of the remaining four counts. As already noted, the central question before the jury was whether or not to believe Sweet. His testimony about second-hand claims by Holder that Wada was her source was the only direct evidence linking Wada to the leaked information. With Sweet's credibility on the line, the prosecutor's *repeated* vouching for Sweet's trustworthiness and the Government's purported investigation stamped the Government's imprimatur on the precise issue that would decide the outcome of the case. And then the Government went even further, by claiming that Bob Ross and the federal agents would have testified that "all roads lead to Jeffrey Wada." A762. Those errors were then still further

compounded by the Government's attack and mischaracterization of defense counsel's argument. Ultimately, those statements must be considered not in isolation but for their cumulative impact. *See Certified Envtl. Servs., Inc.*, 753 F.3d at 95; *United States v. Ballard*, 727 F. App'x 6, 10-12 (2d Cir. 2018).

Here, the cumulative impact is plain: Wada was denied a fair trial. His convictions should be vacated.

## CONCLUSION

For the foregoing reasons, Wada's convictions should be reversed. In the alternative, the Court should vacate the convictions and remand the case for a new trial.

Dated: March 13, 2020

Respectfully submitted,

*/s/ Roman Martinez*

Roman Martinez
Michael Clemente*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Jason M. Ohta
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130

*Admitted to practice in Maryland only. All work supervised by a member of the DC Bar

Stephen R. Cook
BROWN RUDNICK LLP
2211 Michelson Drive
Irvine, CA 92612

Justin S. Weddle
WEDDLE LAW PLLC
250 West 55th Street, 30th Floor
New York, NY 10019

*Counsel for Appellant Jeffrey Wada*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 13,949 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point Times New Roman font.

Dated: March 13, 2020

*/s/ Roman Martinez*
Roman Martinez